## In re Anonymous No. 22 D.B. 78

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

HAMMERMAN, *Board Member,* May 6, 1980— Pursuant to Pa.R.D.E. 208(d), the Disciplinary Board of the Supreme Court of Pennsylvania (board), submits its following findings and recommendations to your honorable court with respect to the above captioned matter.

### I. HISTORY OF PROCEEDINGS

On April 7, 1978 a petition for discipline was filed by the office of Disciplinary Counsel. No answer was filed within the prescribed time and the matter was duly referred to hearing committee. Upon due notice given, the hearing commenced on November 27, 1978. The duties of Disciplinary Counsel were performed by [ ], Esq. and [ ] Esq. represented respondent. Prior to the conclusion of the hearings on June 5, 1979, counsel for respondent was placed on inactive status, and respondent represented himself.

On January 17, 1980 the hearing committee recommended a suspension of six months. Disciplinary Counsel did not file a brief on exceptions and no objections were filed within the prescribed time.

Thereafter, [H], Esq. filed a brief on exceptions on

behalf of respondent on February 15, 1980 and petitioner filed a brief opposing exceptions on March 3, 1980.

This case arises out of five charges in the petition for discipline filed against respondent alleging that respondent has violated the following Disciplinary Rules of the Code of Professional Responsibility:

(a) D.R. 1-102(A)(4): A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(b) D.R. 6-101(A)(3): A lawyer shall not neglect a legal matter entrusted to him;

(c) D.R. 7-101(A)(2): A lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services . . . ;

(d) D.R. 7-101(A)(3): A lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship . . . ;

(e) D.R. 7-102(A)(3): In his representation of a client, a lawyer shall not conceal or knowingly fail to disclose that which he is required by law to reveal;

(f) D.R. 1-102(A)(5): A lawyer shall not engage in conduct that is prejudicial to the administration of justice;

(g) D.R. 7-101(A)(1): A lawyer shall not intentionally fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules . . . ;

(h) D.R. 7-102(A)(5): In his representation of a client, a lawyer shall not knowingly make a false statement of law or fact;

(i) D.R. 2-110(A)(1): If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from em-

ployment in a proceeding before that tribunal without its permission.

## II. DISCUSSION

Charge I, after hearing, was dismissed for lack of evidence, and the hearing committee's recommendation was based on the remaining four charges. Charge II involved [A], a client of [B], Esq. [A] was defendant in a divorce action instituted by her husband in 1970. On [B's] ascending the bench, respondent took over the file from [B]. Respondent was charged with failure to negotiate a property settlement of the real estate which was to be conveyed to [A] by her husband coincidental with the divorce.

[A] is still residing in the property and paying the mortgage and her former husband has made no demand on her in connection therewith. She also stated that she did not know her divorce was final until Disciplinary Counsel advised her. She further testified that she received a letter from respondent setting up an appointment for her at his office on a Saturday in 1977. She stated she came to the building but was not permitted upstairs by the guard and that she sat downstairs for a long period of time and then left. She never made any attempt to call respondent at his office so that he could send down for her. She testified:

"Q. So as of now, the only knowledge you have is that your husband may have agreed with Mr. [F] that he should sign over the deed in your favor; is that correct?

A. Yes.

Q. And you do not know whether that was ever related to respondent, do you?

A. No."

The hearing committee found that respondent neglected the matter, D.R. 6-101(A)(3), and prejudiced or damaged his client during the course of the professional relationship, D.R. 7-101(A)(3).

Charge III involved the estate of [G] who died on May 1, 1971. Three sons of decedent engaged respondent to represent them and serve as administrator of their father's estate. These sons were cousins to respondent. Respondent was charged with neglect of this estate and another attorney was engaged to wind up the matter. The attorney testified that he did not receive the file from respondent until 1978, although he made attempts to contact respondent in 1977. [J], Esq. testified that as attorney for the purchaser he drew up the agreement of sale in 1976 and that the purchase price was $4,000 although there was a mortgage of $3,600. He stated that he sent the agreement to his client, who returned the same to him signed but that respondent's name did not appear thereon as administrator. Respondent testified that the heirs disagreed among themselves as to the disposition of the property and that he was not disposed to sell the property because of their disagreement.

The hearing committee concluded that respondent neglected the matter, D.R. 6-101(A)(3), intentionally failed to seek the lawful objective of his clients, D.R. 7-101(A)(1), and intentionally failed to carry out a contract of employment entered into with clients for professional services, D.R. 7-101(A)(2).

Charge IV relates to the criminal trial of [C] in [  ] County involving charges of burglary and robbery. Respondent represented [C] at trial and timely filed an appeal from the conviction. It was charged that

respondent failed to file an appellate brief on behalf of [C] resulting in a judgment of non pros. [C] testified that he had retained [D], who upon ascending the bench, referred this matter to respondent. [C's] testimony was that respondent requested $500 for the appeal. He also stated that his wife paid that sum. [C] also testified that the conviction in question was his first offense. On cross-examination, however, he admitted that he had been convicted of a crime prior to the one for which he was presently serving time. He further testified that he had assigned $1,000 of his bail to Judge [D] on account of a fee of $1,600; had never paid respondent any money himself; but then had his wife collect the bail money despite the assignment.

Mrs. [C] testified that she paid $500 to respondent on May 21, 1976, a week after the sentencing of her husband, for the appeal. She also testified that she had made arrangements to pay respondent other sums over a period of time but stopped at her husband's direction. On cross-examination, Mrs. [C] could not verify giving Judge [D] or respondent any money prior to trial, nor did she have any receipts evidencing any other payments.

The hearing committee concluded that respondent engaged in conduct prejudicial to the administration of justice, D.R. 1-102(A)(5), and neglected a legal matter entrusted to him, D.R. 6-101(A)(3).

Charge V dealt with the matter of [E] who was convicted in a criminal trial in the United States District Court for the District of Connecticut and when respondent agreed to represent on appeal. Later, respondent moved for leave to withdraw which was denied. Respondent did not thereafter

further pursue the interests of his client, stating that he had not received notice of the denial. The hearing committee concluded that respondent engaged in conduct prejudicial to the administration of justice, D.R. 1-102(A)(5), withdrew from employment in a proceeding before a tribunal without its permission, D.R. 2-110(A)(1), neglected a matter entrusted to him, D.R. 6-101(A)(3), and intentionally prejudiced or damaged his client during the course of the professional relationship, D.R. 7-101(A)(3). Based on the entire record, the hearing committee recommended that respondent be suspended from the practice of law for a period of six months.

Respondent testified in his own behalf. With reference to the [A] matter, he stated that until he received notice of the complaint against him, he was unaware of any proposed property settlement in connection with the divorce. He also stated that he "first fell ill in August, 1977," had surgery in the fall of that year, and came back to his office in December, "because the Court Administrator's Office ordered me back to try cases."

A special program for respondent was set up to dispose of approximately 45 or 50 cases when respondent had a relapse in the courtroom. He did not return to his office until February, 1978. Respondent testified that the file of [A] which was turned over to him by Judge [B] contained no information relative to a deed.

". . . It is just not in the file from any of the correspondence from Judge [B] to Mr. [F] to Judge [B] to me, there is nothing in the file that mentioned a deed and there is nothing in the file that indicates that Judge [B] had gone into any detail about the property, the real estate with Mrs. [A] to ascertain

her position that she wanted to transfer of the deed. There is just nothing in the file with respect to any mention of the deed.

Q. And, obviously, there was no property settlement or agreement ever drawn when you got the file; is that right?

A. That's right.

Q. Did Mrs. [A] ever request you to negotiate or draw up a property settlement agreement in order to secure her rights in the property prior to the Divorce Decree being granted?

A. No."

With reference to [C], respondent stated it was one of the files turned over to him by Judge [D] and that the total amount of the fee charged was $4,500 of which he received the $500 previously mentioned. He went to trial for [C], petitioned for bail pending the appeal, and filed the appeal papers. He stated that he requested an extension of time to allow [C] to secure other counsel which was granted.

When counsel for respondent was placed on inactive status, respondent requested time within which to secure other counsel, which was opposed by Assistant Disciplinary Counsel. The request was denied by the hearing commitee chairman and, subsequently, the board chairman. The hearing then proceeded on the testimony to aid the committee in its recommendation. Although the committee recommended a suspension period of six months, the board, after full and extensive discussion and due deliberation, voted unanimously to recommend that the Supreme Court of Pennsylvania publicly censure respondent and place him on probation for one year.

To summarize the position of the board, it appears that respondent was thrust into accepting files of both Judge [B] and Judge [D] upon their ascending the bench, without any distinct orderly system. Respondent then became ill in the summer of 1977 leading to an operation in the fall of that year. Being a single practitioner, it is understandable that he would be fearful of alerting clients of his disability and therefore neglected to advise them of his inability to manage their matters. However, he failed to send his clients bills so that they would be put on notice that he expected to be paid certain amounts for his services. In addition, upon his return to practice, he was thrust into a mandatory trial room, suffered a relapse, and was again out of his office for a period of time. Respondent was, therefore, unable to handle his matters for approximately six months. Due to lack of adequate communication with his clients, and lack of guidance from an older practitioner, the instant charges against him were instituted.

The board finds persuasive the argument of respondent in the [A] matter that the need to secure a property settlement was never transmitted to him; that in the [G] case, he never agreed to a sale of the premises for such a small return to the heirs, and that respondent advanced moneys to an heir against his share; that in the [C] matter, the testimony of [C] and his wife was not credible. The board does concede that respondent did fail to proceed in the interests of his client, [E], and is therefore chargeable with neglect of a matter entrusted to him. In mitigation of the acts of commission and omission of respondent, while it is true that [A] did not receive sole ownership of the property in question, she has had exclusive control thereof, in-

cluding the rents. In the [G] estate, the heirs professed to be content with the sale of the property and the estate was finally concluded. In the [C] matter, a subsequent appeal was taken, albeit not favorable to this defendant. The consequences of the failure of respondent to complete his representation of [C] was dismissal of the appeal.

It appears that the most reprehensible action of respondent was his inability to turn down any representation whenever asked. In addition, his physical health was such at that time that he could not attend to these matters properly but failed to turn them over to anyone else. The board, therefore recommends that respondent be publicly censured and placed on probation for one year.

[H], Esq., who filed a brief on behalf of respondent, practices in respondent's suite and has offered to monitor him during the probationary period. It is, therefore, suggested that Mr. [H], or such other person as the court may deem suitable, be appointed monitor and charged with the duty of supervising the work product of respondent, scheduling his periodic billing, requiring him to accept cases only in the fields of his expertise and overseeing adequate communication to clients. The monitor should also be charged with providing the board with a quarterly report of the activities of respondent in his practice in the above respects. While the board does believe that the formulation of a probationary plan for a respondent should primarily be his responsibility, since no detailed plan has been presented, it is hoped that the requirements above outlined will be the minimum standards of any probation plan.

While probation has not been utilized to any great extent, In re Anonymous, Nos. 31 D.B. 77 and 37

D.B. 77, 9 D. & C. 3d 526 (1978), your honorable court did order public censure and probation based upon specific terms.

In Office of Disciplinary Counsel v. Anonymous, No. 74, Disciplinary Docket No. 1 (Supreme Court), Nos. 43 D.B. 73 and 39 D.B. 74 (Disciplinary Board), where public censure was imposed, no mitigating factors were present as in the instant case. Your honorable court has however, previously held that where there are mitigating factors, a six month suspension was too severe and imposed public censure: Office of Disciplinary Counsel v. Anonymous, No. 70, Disciplinary Docket No. 1 (Supreme Court), No. 3 D.B. 74 (Disciplinary Board).

In In re Anonymous No. 46 D.B. 77, 8 D. & C. 3d 211 (1978), an attorney was delinquent in his representation of an estate while suffering from severe emotional problems. There, too, the board, recommended lesser discipline than suspension.

## III. RECOMMENDATION

The Disciplinary Board, therefore, recommends to this honorable court that at No. 22 D.B. 78, respondent be subjected to public censure and be subject to probation for the period of one year under the terms above described and such other terms as this honorable court may deem suitable under the circumstances.

## ORDER

EAGEN, *C.J.*, And now, May 29, 1980, the recommendation of the Disciplinary Board of the Su-

preme Court of Pennsylvania dated May 6, 1980, is rejected; and it is ordered that [Respondent] of [    ] be, and is forthwith suspended for a period of not less than four months with the right to apply for reinstatement pursuant to Pa.R.D.E. 218 at any time he complies with Rule 217 of Disciplinary Enforcement.

Mr. Justice Nix would accept the recommendation of the board.